UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GLOBAL CROSSING BANDWITH, INC.,


                                        Plaintiff,

                                                                    DECISION AND ORDER

                                                                    05-CV-6423L


                        v.

OLS, INC., a Georgia Corporation,
TELEUNO, INC., a Delaware Corporation,
jointly and severally,


                                        Defendants.
_____


        Plaintiff, Global Crossing Bandwidth, Inc. ("Global"), brings this action against defendants

OLS, Inc. and TeleUno, Inc., alleging claims arising out of the alleged breach of a contract for

telecommunications services.  Jurisdiction is premised upon diversity of citizenship pursuant to 28

U.S.C. § 1332.  Currently pending before the Court are three motions:  defendants' motion for

summary judgment, plaintiff's cross-motion for "partial" summary judgment, and defendants'

motion to strike certain materials that have been filed by plaintiff as part of its motion papers.


                                **FACTUAL BACKGROUND**

        Global is a California corporation with its principal place of business in New York.  OLS is

a Georgia corporation with its principal place of business in Georgia, and TeleUno is a Delaware

corporation with its principal place of business in Florida.  TeleUno and OLS share at least some common management.  *See* Dkt. #27 ¶¶ 1, 2, #29, ¶¶ 1, 2.

Global is telecommunications company that offers wholesale telecommunications services to other carriers.  OLS and TeleUno are common carriers that offer basic telephone long-distance service.  They are retail long-distance companies that service accounts but must utilize others, wholesale providers like Global who provide the actual communication network.

In August 2000, Global and OLS entered into a carrier service agreement ("OLS Agreement") whereby OLS agreed to purchase from Global certain telecommunications services for resale to OLS's customers.  *See* Complaint Ex. A.  The OLS Agreement was amended and renewed on various dates in 2002 and 2003.  *Id.*  Global and TeleUno entered into a similar agreement ("TeleUno Agreement") in October 2003.  Dkt. #24 Ex. 1.

Under the agreements, OLS and TeleUno agreed to pay Global certain minimum monthly charges.  The OLS Agreement provided that beginning with the third month of the agreement, OLS would be liable for a minimum monthly usage charge ("MMUC") of $100,000, which would increase to $250,000 beginning with the eighth month.  OLS Agreement § 3.8.  The TeleUno Agreement provided that TeleUno and OLS would be jointly and severally liable for a $150,000 MMUC beginning with the first month of the agreement.  TeleUno Agreement § 3.9.

Global submitted monthly invoices to OLS and TeleUno for services provided to them under their respective agreements.  Global alleges that both defendants breached the agreements by failing to meet or pay the MMUCs under the agreements.  Complaint ¶ 10; Plaintiff's Local Rule 56.1

Statement (Dkt. #38) ¶ 10.  The MMUCs are one of the principal areas of dispute between Global and defendants.

Another significant dispute concerned Global's imposition of charges for disputes involving changes in end-users' long-distance carriers.  Generally, if a customer decided to change his primary long-distance service provider (commonly referred to in the industry as a "primary interexchange carrier" or "PIC") from his prior PIC to either TeleUno or OLS, the customer would be assessed a fee for the changeover by the customer's local telephone service provider.  If the customer complained that he had never authorized the change, however, the local carrier would impose a charge ("primary interexchange carrier change" or "PICC" charge) on Global, which would then pass those charges on to either TeleUno or OLS.[1]

Defendants contested over $400,000 in PICC charges, asserting that the relevant records showed that the customers in question had not lodged PICC complaints, or that the customers had in fact selected OLS or TeleUno as their PIC, or long distance provider.  Defendants allege that because Global threatened to disconnect their service if the PICC charges were not paid, defendants paid the charges despite their belief that the charges were invalid.

As these and other disputes continued to multiply, the relationship between Global and defendants got progressively worse.  The end came in March 2005, when defendants terminated Global's services.  Declaration of Geri Eubanks (Dkt. #27) ¶ 75.  Global continued to send invoices based on the MMUCs through June 2005, the end-date of the most recent contract.  The unpaid MMUCs total about $1.3 million.  Dkt. #25 ¶ 21.

---

[1]"The term interexchange carrier means a telephone company that provides telephone toll service," *i.e.*, long distance service.  47 C.F.R. § 64.4001(d); *see also* 47 C.F.R. § 51.5.

Global filed the complaint in this action on August 9, 2005.  Global asserts five causes of action.  The first two are against OLS and TeleUno, respectively, alleging breach of contract for failing to pay MMUCs and other fees.  The remaining causes of action are asserted, in the alternative, against both defendants:  a claim based on theories of quantum meruit, unjust enrichment, and constructive trust, alleging that defendants have not compensated Global for the full value of the services rendered to them by Global; an "account stated" claim based on Global's statements of account and invoices issued to defendants; and a claim based on OLS's guaranty of TeleUno's performance under the TeleUno Agreement, and on both defendants' agreement that they would be jointly and severally liable for all MMUCs and termination fees imposed under the agreements.  Based on these claims, Global seeks an award of the sums allegedly owed to it by defendants, together with costs, interest and attorney's fees pursuant to the agreements.  Global also seeks the imposition of a constructive trust on revenues received by defendants derived from the services provided to them by Global, and other similar relief.  Complaint at 8.

On October 10, 2005, defendants filed their answer in this action, together with nine counterclaims.  The first counterclaim is for breach of contract, based on the events giving rise to the PICC charges, and various alleged improprieties in Global's billing and collection practices with respect to defendants.  Dkt. #5 ¶¶ 111-48.  The second and third counterclaims are for tortious interference with contracts and tortious interference with prospective business relations, respectively, based on defendants' allegations that Global's various breaches of the agreements interfered with defendants' relationships with their existing and prospective customers.  *Id.* ¶¶ 149-76.  The remaining causes of action are for violations of the Federal Communications Act, 47 U.S.C. § 201,

violations of New York General Business Law § 349, and other New York common law claims. *Id.*
¶¶ 177-211.

As stated, defendants have moved for summary judgment in their favor on their
counterclaims, and dismissing Global's claims against them.  Global has cross-moved for summary
judgment dismissing defendants' counterclaims, and in Global's favor on its claims concerning the
MMUCs and PICC charges.

## DISCUSSION

### I. Minimum Monthly Usage Charges

Both sides have moved for summary judgment on the MMUC issue.  Defendants contend that
the MMUCs are an unenforceable penalty.  Global contends that the MMUCs are a valid component
of a bargained-for contractual provision, and that Global is entitled to collect these fees.  I agree that
Global is entitled to recover these fees.

The OLS Agreement provides at § 3.8 that if during any month to which an MMUC applies,
OLS's net charges for services are less than the applicable MMUC, "OLS shall pay the shortfall."
The agreement also provides that if it "is terminated prior to the time the Minimum Charge becomes
effective (other than termination by OLS for an uncured breach by Global Crossing), OLS shall be
liable for" an amount equal to the MMUC for the remaining portion of the unexpired term of the
agreement. *See* OLS Agreement § 5.5. The MMUCs sought by Global in this action include both
fees for months in which there was a shortfall and fees for the months remaining on the contracts
after their termination by defendants. *See* Affidavit of Michael Lord (Dkt. #37-3) ¶¶ 9-14.

In exchange for that commitment by OLS, Global agreed that, provided that the MMUCs and certain other commitments were met, OLS would receive a $25,000 credit commencing at the fourth billing cycle, and again commencing at the seventh billing cycle.  OLS Agreement § 3.9.  OLS also expressly agreed that the MMUCs for which it was liable were "based on agreed upon minimum commitments on its part and corresponding rate concessions on Global Crossing's part, and are not penalties or consequential or other damages ... ."  OLS Agreement § 3.11.  The TeleUno Agreement contained similar provisions.  *See* TeleUno Agreement §§ 3.9-3.11.

Notwithstanding these provisions, defendants contend that the MMUCs are unenforceable under both New York and federal law.   Although defendants did not object during the several year terms of the contracts, they now argue that "the inherent character of the MMUC is a penalty," Defendants' Mem. of Law (Dkt. #24) at 14, and that defendants should not be held liable for the MMUCs because they met their *overall* minimum commitments.   In other words, defendants contend, their total usage over the entire term of the agreements exceeded the total MMUCs agreed to, so that they should not be penalized for failing to meet the MMUCs in any given month.

Although the agreements here are quite specific as to the payment terms of the contract, and they do not use the term "liquidated damages," that is what, on their face at least, the provisions allowing Global to collect the total unpaid MMUCs in the event of a breach by defendants provide for.  *See United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 740 (2[d] Cir. 1989) (describing liquidated damages as a contractually predetermined "amount of compensation due in case of a breach of contract").  As stated, defendants contend that these provisions do not in fact provide for

true liquidated damages–which are generally allowable–but rather impose penalties for breach of contract, which are not.

"Whether a contract clause which nominally prescribes liquidated damages is in fact an unenforceable penalty provision is a question of state law." *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 141 (2[d] Cir. 1982). By their terms, the agreements are governed by New York law. *See* Dkt. #1-2 at 17; #24-2 at 13. Thus, New York law controls here with respect to this issue.

Under New York law, "[i]t is well established that whether a clause 'represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances.'" *Jackson Heights Care Center, LLC v. Bloch*, 39 A.D.3d 477, 479 (2[d] Dep't 2007) (citing *JMD Holding Corp. v Congress Fin. Corp.*, 4 N.Y.3d 373, 379 (2005)). As a general rule,

> [a] liquidated damages clause ... will be upheld by a court, unless the liquidated amount is a penalty because it is plainly or grossly disproportionate to the probable loss anticipated when the contract was executed. Liquidated damages are not penalties if they bear a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. The party challenging the liquidated damages provision bears the burden of proving that the provision constitutes a penalty.

*Wechsler v. Hunt Health Systems, Ltd.*, 330 F.Supp.2d 383, 413 (S.D.N.Y. 2004) (citations omitted); *accord Allied Van Lines, Inc. v. Triple C Transp. Inc.*, 387 F.Supp.2d 238, 244 (W.D.N.Y. 2005).

"A party requesting that a court strike down a liquidated damages provision as an unenforceable penalty must demonstrate that the damages are not a reasonable measure of the actual loss resulting from the breach, and the actual loss is readily ascertainable." *Zeer v. Azulay*, 50 A.D.3d 781 (2[d] Dep't 2008). In determining whether defendants have met that burden, it is important to remember the New York Court of Appeals' observation that "[t]oday the trend favors

freedom of contract through the enforcement of stipulated damage provisions as long as they do not

clearly disregard the principle of compensation." *JMD Holding*, 4 N.Y.3d at 381 (citing *XCO Int'l*

*Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1002-1003 (7ᵗʰ Cir. 2004), for the proposition that "[t]he

rule [against penalty clauses] hangs on, but is chastened by an emerging presumption against

interpreting liquidated damages clauses as penalty clauses").    As Chief Judge Richard A. Posner

said in *XCO Int'l,* 369 F.3d at 1002, "[t]he rule against penalty clauses, though it lingers, has come

to seem rather an anachronism, especially in cases in which commercial enterprises are on both sides

of the contract."[2]

   To decide whether a particular provision constitutes an unenforceable penalty, the Court must

"give due consideration to the nature of the contract and the attendant circumstances." *Wilmington*

*Trust Co. v.. Aerovias de Mexico*, 893 F.Supp. 215, 218 (S.D.N.Y. 1995); *Bigda v. Fischbach Corp.*,

849 F.Supp. 895, 902 (S.D.N.Y. 1994).  "Relevant to this analysis is the 'sophistication of the parties

and whether both sides were represented by able counsel who negotiated the contract at arms length

without the ability to overreach the other side.'" *Wilmington Trust Co.*, 893 F.Supp. at 218; accord

*Austin Travel*, 867 F.2d at 741 (noting that "[t]he parties to the contracts negotiated at arms length

and without misinformation"); *Pacificorp Capital, Inc. v. Tano, Inc.*, 877 F.Supp. 180, 184

(S.D.N.Y. 1995) ("parties' bargaining power is a factor when determining if one side is exacting an

unconscionable penalty"); *Bigda*, 849 F.Supp. at 902 ("relevant here is whether the parties were

sophisticated and represented by counsel, [and whether] the contract was negotiated at arms-length

---

[2]I also note that in an unreported case, the Second Circuit, citing *JMD Holding*, held that
a district court erred in concluding that a liquidated damages provision in a real property lease
was an unenforceable penalty. *See 4 Third Ave. Leasehold,LLC v. Permanent Mission of the
United Arab Emirates to the United Nations*, 133 Fed.Appx. 768, 769-70 (2d Cir. 2005).

between parties of equal bargaining power"); *Interpetrol Bermuda Ltd. v. Stinnes Interoil, Inc.*, No. 88 Civ. 8620(PKL), 1990 WL 250169, at *4 (S.D.N.Y. Dec.26, 1990) (confirming arbitration award where panel found arms-length bargaining and no deceit).

Taking all these factors into account, I find that the MMUCs are not a penalty, and that the contractual clauses providing for the MMUCs are enforceable.  The MMUCs are part of a valid *quid pro quo* in a contract entered into by sophisticated business entities, which defendants agreed to in exchange for rate-concessions on Global's part.

First, I note that, on their face, these provisions clearly did not contemplate any sort of "aggregate usage" arrangement.  In other words, the contracts did not provide that defendants would be excused from meeting their MMUCs in any given month as long as their total usage over the entire contract period met or exceeded the aggregate of the MMUCs during that period.  *See*, *e.g.*, OLS Agreement § 3.8 (providing for MMUC of $250,000 for the "8th month and *each month thereafter*") (emphasis added).  The contract is quite clear on this point.

As stated, the contracts also set forth a *quid pro quo* between the parties.  Global gave consideration, in the form of rate-concessions, for the MMUCs.  Each agreement stated that the "make up to minimum charges, shortfall charges and surcharges for which [OLS or TeleUno was] liable under this Agreement [we]re based on agreed upon minimum commitments on [OLS's or TeleUno's] part and corresponding rate concessions on Global Crossing's part ... ."[3]  Thus, this was not simply a one-sided provision, the benefits of which inured only to Global, but a mutual

---

[3]In addition, the OLS Agreement provided that "[i]n exchange for the $250,000 Minimum Charge commitment [by OLS], ... Global Crossing agrees that certain credits will be applied to OLS's account," including a $25,000 credit at the start of the fourth billing cycle and another $25,000 credit at the start of the seventh billing cycle.  OLS Agreement ¶ 3.9

agreement imposing obligations, and conferring benefits, on both sides.  *See Ehrenworth v. Kaufelt*, 8 Misc.3d 10, 11-12 (Civ. Ct. 2005) (liquidated-damages clause was enforceable, because, *inter alia*, "the provision represented a bargained-for element in a multi-faceted agreement").  Defendants were not "mom and pop" stores but sizeable entities engaging in a complex business involving millions of dollars.

In support of their contention that the MMUCs are a penalty, defendants contend that the MMUCs are disproportionate to any actual injury suffered by Global as a result of defendants' termination of Global's services.  I am not persuaded by that argument.

The relevant question in this regard is whether the challenged provision was "a reasonable estimate [of the probable losses that would flow from a breach] at the time the contract was negotiated and executed."  *Allied Van Lines*, 387 F.Supp.2d at 244 (quoting *Crown It Services, Inc. v. Koval-Olsen*, 11 A.D.3d 263, 266 (1st Dep't 2004)).  *See also McKinley Associates, LLC v. McKesson HBOC, Inc.*, 110 F.Supp.2d 169, 178 (W.D.N.Y. 2000) ("In determining whether a contractual provision provides for enforceable liquidated damages or for an unenforceable penalty, the contract must be interpreted in light of the potential loss discernable as of the date of its execution, rather than as of the date of the breach"); *DAR & Associates, Inc. v. Uniforce Services, Inc.*, 37 F.Supp.2d 192, 202 (E.D.N.Y. 1999) ("If a disparity between actual and liquidated damages has any relevance at all, it is only to the extent it sheds light on the reasonableness of the agreement viewed *ex ante*").

At the time that the agreements here were entered into, estimating Global's probable damages in the event of a breach by defendants would not have been as simple a matter as defendants suggest.

- 10 -

Had defendants continued to utilize Global's services under the agreements, they would have been obligated to pay the MMUCs or the charges for their actual usage (at discounted rates), whichever was greater.

Defendants argue that the MMUCs are not reasonable estimates of Global's damages in the event of a breach because they do not take into account Global's cost of providing telecommunications services to defendants. In other words, defendants contend that the MMUCs represent what would have been Global's gross revenues from the contract, not its net revenues.

It is not at all clear, however, nor would it have been clear to the parties at the time of contract formation, what Global's net revenues would have been had the contract remained in force for the duration of its term. Had defendants continued to utilize Global's services, but at low monthly usage levels, they would have been obligated to pay the MMUCs, but the cost to Global of providing the service would have been correspondingly low. On the other hand, had defendants' actual usage far exceeded the MMUCs, Global's costs of providing services to defendants would have risen, but so would its profits.

Courts are justifiably reluctant to substitute their after-the-fact conclusions regarding the proportionality of liquidated damages provisions for the *ex ante* estimates of the parties. *See*, *e.g.*, *United Merchants and Mfrs.*, 674 F.2d at 142 (bankruptcy court erred by using hindsight in determining that claimants had failed to show that damages were so difficult to estimate that pre-payment charge in contract constituted a valid liquidated damages estimate rather than a prohibited penalty); *McKinley Associates*, 110 F.Supp.2d at 178 ("Generally, courts should not interfere with an agreement for liquidated damages absent some persuasive justification"); *Lease*

- 11 -

*Corp. of America Inc. v. Resnick*, 288 A.D.2d 533, 535 (3d Dep't 2001) (contract provision constituted a valid liquidated damages clause, not a penalty; "While defendants, with the benefit of hindsight, may have made a bad bargain, it is not the function of this Court to rewrite the parties' agreement").

Given that reluctance, I cannot say as a matter of law that the liquidated damages clauses at issue here are invalid based on any disproportionality between the amount of the MMUCs and Global's damages. *See Xerox Corp. v. Addressing Services Co.*, No. CV075003896, 2007 WL 4755009, at *5 (Conn. Super. Ct. 2007) (holding that provision in service contract calling for payment of monthly minimum charge was an enforceable liquidated damages provision, in part on ground that defendant had not shown that damages flowing from early termination of contract were readily ascertainable when parties entered into contract) (applying New York law); *see also City of Memphis v. Ford Motor Co.*, 304 F.2d 845, 848-52 (6th Cir. 1962) (provision in contract for supply of electric power to defendant's automobile assembly plant, that defendant would pay minimum monthly bills during the five-year term of the contract, was enforceable liquidated damages provision rather than a penalty, and defendant, which had sold plant and ceased operations there prior to expiration of contract term, was obligated to pay monthly minimums for remainder of contract period).

Defendants also contend that the MMUCs violate the Communications Act ("Act"), which provides in part that "[a]ll charges ... for and in connection with ... communication service [that is subject to the Act] shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful."  47 U.S.C. § 201(b).  The

Federal Communications Commission ("FCC"), however, has expressly found such provisions to be valid under the Act.

In *In re Ryder Communications, Inc. v. AT&T Corp.*, 18 F.C.C.R. 13603 (2003), the FCC upheld an early-termination provision in a contract between Ryder, a provider of "900" number telephone call services, and AT&T.  Under the parties' contract, AT&T agreed to provide 900 transport service to Ryder for three years, beginning in April 1997, at discounted usage rates based on Ryder's projected volume of 900 calls.  In exchange for those volume discounts, Ryder agreed to meet certain prescribed "Minimum Annual Revenue Commitments" ("MARC"), regardless of whether it actually incurred sufficient volume to generate such revenue in usage charges.  Ryder also agreed that, in the event Ryder discontinued service prior to the expiration of the three-year term, AT&T could charge Ryder an early service termination fee in "an amount equal to 100% of the unsatisfied MARC for each year remaining in the Custom Offer Agreement term."

For various reasons, Ryder closed its business in June 1997, and notified AT&T the following month that it was canceling its services under the contract.  Pursuant to the terms of the early service-termination provision, AT&T notified Ryder in November 1997 of Ryder's liability to AT&T in the amount of approximately $1.6 million in early service-termination charges.

Ryder then filed an action against AT&T, alleging, *inter alia*, that the early service-termination provision violated the reasonableness standard of section 201(b) of the Act.  The FCC rejected that argument, holding that the early-termination provision was not unjust or unreasonable on its face.  In so ruling, the FCC stated that it

> has consistently allowed carriers to include provisions in their tariffs that impose early termination charges on customers who discontinue service before the expiration of a

long-term discount rate plan containing minimum volume commitments. Many of these provisions required individual customers, like Ryder, to pay charges similar, if not equivalent to, the charges that the customers would have paid had they continued service and fulfilled their minimum volume commitments. In approving these provisions, the Commission recognized implicitly that they were a valid *quid pro quo* for the rate reductions included in long-term plans. The Commission has acknowledged that, because carriers must make investments and other commitments associated with a particular customer's expected level of service for an expected period of time, carriers will incur costs if those expectations are not met, and carriers must be allowed a reasonable means to recover such costs.

*Id.* at 13617 (footnotes and citations omitted).

The same reasoning applies here. The agreements expressly provided that the MMUC provisions were accepted in exchange for rate-concessions on the part of Global Crossing. Although defendants insist that there is no proof that they ever got any such concessions, the contracts are clear on their face in that regard, and defendants cannot manufacture an issue of fact simply by contradicting them. *See General Elec. Co. v. Compagnie Euralair, S.A.*, 945 F.Supp. 527, 535 n. 9 (S.D.N.Y. 1996) (stating that defendant's president "may not create a triable issue of fact by contradicting the unambiguous terms of a written contract"); *Cliffstar Corp. v. Cape Cod Biolab Corp.*, 37 A.D.3d 1073, 1074 (4th Dep't 2007) ("The affidavits of defendant's president did not explain or supplement the unambiguous contract price but, rather, they impermissibly contradicted it," and did not raise an issue of fact") (quotation marks and alterations omitted).[4]

---

[4]At oral argument, counsel for defendants stated that defendants "didn't get [the rate concessions] because we didn't achieve the benchmarks which triggered them." Dkt. #82 at 20. Defendants cannot, however, use their own failure to satisfy the conditions for receiving rate concessions as a basis for arguing that there was no *quid pro quo* for the MMUCs.

## II. PICC Charges

Another area of dispute concerns the PICC charges.  Defendants contend that they paid

Global nearly $420,000 in unwarranted PICC charges, which were generated when a customer of

defendants complained to Global–usually through the customer's local telephone company ("Local

Exchange Carrier" or "LEC")–that the customer had not authorized defendants, who are resale

common carriers ("RCCs"), to act as the customer's long distance carrier, or PIC.  Global alleges

that defendants still owe it thousands of dollars in unpaid PICC charges.  Defendants deny that and

have asserted counterclaims in this action seeking to recoup the PICC charges that they have already

paid.

When a customer changes his PIC, the LEC may assess a charge against the customer for that

change.  If the customer complains that he never authorized the change (referred to in the industry

as a "slamming" complaint), the LEC will typically pass those charges on to the interexchange

carrier of record, which in this case was Global.  Diane Peters Decl. (Dkt. #37-5) ¶ 6; Michele Jones

Decl. (Dkt. #29) ¶ 37.  Where the PIC at issue is a resale carrier, such as OLS and TeleUno, those

charges may then be passed on by the interexchange carrier, *i.e.*, Global, to the relevant RCC, *i.e.*,

OLS or TeleUno.  Peters Decl. ¶ 8; Jones Decl. ¶ 37.  That is what occurred here.

In the case at bar, it is undisputed that Global assessed hundreds of thousands of dollars in

PICC charges against defendants.  Global contends that those charges, which were initially imposed

on Global by the relevant LECs, were attributable to unauthorized changes of consumers' long-

distance carriers to defendants, and that Global simply passed those charges on to defendants, as it claims it was entitled to do under the agreements.

In response, defendants assert that PICC charges should not be imposed on a resale carrier if the customer did choose that RCC as his PIC. According to defendants, they investigated the PICC charges assessed against them by Global, and discovered that most if not all of those charges were invalid, *i.e.*, that the customers had in fact selected defendants as their PICs. Jones Decl. ¶¶ 45-53. Defendants therefore lodged disputes with Global concerning those charges. Defendants contend that Global simply refused to consider their submissions concerning the alleged invalidity of the charges, but that defendants nevertheless paid almost all of the charges, because of Global's threats to discontinue defendants' service if they did not.

Having reviewed the parties' agreements and the applicable regulations, I conclude that Global is entitled to summary judgment as to liability on the PICC dispute claims. Regardless of whether the end-users had in fact submitted PICC requests, or lodged any complaints in that regard, Global was entitled to pass through to defendants the charges imposed on it by the LECs. In addition, Global was not obligated, under the relevant regulations or the agreements, to investigate or attempt to resolve defendants' disputes concerning these charges, and there is no evidence that Global led defendants to believe that it would do so.

There appears to be no dispute here that the PICC charges were levied upon Global by the relevant LECs. Defendants dispute only whether those charges were valid, *i.e.*, whether the customers actually did submit a request selecting OLS or TeleUno as their long-distance carrier.

- 16 -

Defendants contend that they submitted proof to Global that the customers had submitted such requests, and that Global essentially refused to consider that proof.

The agreements, however, expressly provided that defendants "agree[d] to pay to Global Crossing any ... PICC charges" levied upon Global by a local carrier as a result of services provided by defendants.  TeleUno Agreement § 3.8(A); OLS Agreement § 3.7(A).  They also provided that "[e]xcept as it may otherwise agree in writing, Global Crossing is not obligated to 'work' PIC disputes with respect to 'slamming' or similar claims from End-Users," and that "Global Crossing may pass through any charges imposed on Global Crossing for PIC claims" related to defendants. Dkt. #37-2 at 27, 47.  The agreements contained no provisions requiring Global to make an independent determination of whether the charges were valid. The contracts control here.

In their reply brief, defendants contend that they are *not* asserting that Global had a duty to investigate, in the first instance, the PICC disputes.  Defendant's Reply Mem. (Dkt. #52) at 22. Defendants argue, however, that once they had challenged the factual basis for the PICC charges, and submitted evidence to Global in support of those challenges, Global had a duty to demonstrate that the charges were valid.  Defendants contend that Global should at least have given "good faith consideration" to the evidence that defendants had presented to it.  Defendants' Reply Mem. (Dkt. #52) at 22.

Defendants have not, however, identified the source of that alleged duty on the part of Global.  The agreements certainly imposed no such obligation on Global; if anything, the provisions

stating that Global had no duty to "work" PIC "slamming" disputes suggest that Global was free to take a hands-off approach, leaving resolution of the disputes to defendants and the end users.

Nor did any FCC regulations impose a duty upon Global to verify the information provided to it by defendants, either with respect to the initial selection of a long-distance carrier, or in connection with defendants' submissions challenging the legitimacy of the PICC charges.  With respect to the initial PICC, *i.e.*, the assigning of TeleUno or OLS as a customer's PIC, FCC regulations provide that "[a]n executing carrier shall not verify the submission of a change in a subscriber's selection of a provider of telecommunications service received from a submitting carrier.  For an executing carrier, compliance with the procedures described in this part shall be defined as prompt execution, without any unreasonable delay, of changes that have been verified by a submitting carrier."  47 C.F.R. § 64.1120(a)(2).[5]  *See also In re Implementation of Subscriber Carrier Selection Changes Provisions of the Telecommunications Act of 1996*, 18 F.C.C.R. 5099, 5134 (2003) ("We emphasize ... that we retain our prohibition on executing carrier 're-verification,'" *i.e.*, verification by the executing carrier of a PICC request that has already been verified by the submitting carrier).

---

[5]"The term executing carrier is generally any telecommunications carrier that effects a request that a subscriber's telecommunications carrier be changed."  47 C.F.R. § 64.1100(b).  "The term submitting carrier is generally any telecommunications carrier that requests on the behalf of a subscriber that the subscriber's telecommunications carrier be changed, and seeks to provide retail services to the end user subscriber."  47 C.F.R. § 64.1100(a).  Defendants do not appear to dispute that for purposes of this action, Global was an "executing carrier," and that defendants were "submitting carriers."  *See* Defendants' Reply Mem. (Dkt. #52) at 36.

Once a consumer complains of a "slam," the regulations provide for referral of the consumer's complaint to the FCC or the relevant state commission for resolution.  47 C.F.R. § 64.1150(b).  The regulations and FCC orders make clear that a dispute about whether a PICC charge is substantiated is to be resolved not between the allegedly unauthorized submitting carrier and the executing carrier, but primarily among the allegedly unauthorized carrier and the authorized carrier– *i.e.*, the two competing long-distance carriers, each of which claims the customer as its own–as well as the relevant state commission and the customer alleging the "slam."

In a May 3, 2000 order, the FCC stated that it had previously "require[d] the authorized carrier [*i.e.*, the carrier that the customer has previously selected as the customer's PIC] to conduct investigations to provide an alleged unauthorized carrier with the opportunity to prove that it did not slam the customer."  *In re Implementation of the Subscriber Carrier Selection Changes Provision of the Telecommunications Act of 1996*, 15 F.C.C.R. 8158, 8159 (2000) (citing *id.*, 14 F.C.C.R. 1508, 1521 (1998)).  In the May 2000 order, however, the FCC "revise[d its] rules to place primary responsibility for resolving slamming disputes on state commissions."  *Id.* at 8182.[6]

That order also provided that "an alleged unauthorized carrier must remove all charges assessed for the first 30 days of services from a subscriber's bill upon the subscriber's allegation that he or she was slammed," but that "if a carrier is able to produce proof of verification, it is entitled to receive full payment *from the subscriber* for all services provided."  *Id.* at 8173 (emphasis added).

_____

[6]An FCC regulation that was removed in 2000 likewise provided that upon presentation by the alleged unauthorized carrier to the authorized carrier of a claim that the customer had not been "slammed," the authorized carrier was required to "conduct a reasonable and neutral investigation of the claim ... ."  47 C.F.R. § 64.1180(d) (Oct. 1, 1999 ed.).

In addition, in 2005 the FCC stated that it was "allow[ing] incumbent LECs to spread [PICC costs] over all PIC change requests and recover them through the PIC change charge." *In re Presubscribed Interexchange Carrier Charges*, 20 F.C.C.R. 3855, 3862 (2005).[7]

Ultimately, then, a carrier that is falsely charged with slamming has a remedy against the customer making the charge. That remedy may be obtained through proceedings before the relevant state commission. FCC decisions demonstrate that there are ways and procedures for alleged unauthorized carriers to defend against charges of slamming, but none of the relevant regulations or FCC decisions suggest that the accused carrier has a remedy against an executing carrier such as Global. *See*, *e.g.*, *In re Zoom-I-Net*, IC No. 07-S0288200, DA 08-1118 (F.C.C. May 14, 2008) (denying complaint alleging that complainant's telecommunications service provider had been changed from Verizon to Zoom-I-Net without complainant's authorization).

I conclude, therefore, that Global is entitled to summary judgment on liability as to the parties' competing claims relating to the PICCs. The amount of such charges owing to Global, however, cannot be determined on the record now before me. A trial or inquest on damages is required.

Defendants contend that an internal audit of their own payment records shows that defendants have paid Global nearly $419,000 in PICC charges. Jones Decl. (Dkt. #29) ¶ 33. In support of that assertion, defendants have submitted copies of their payment records (Dkt. #29, Ex. 2).

---

[7]"Incumbent local exchange carriers' are defined in the Act as certain dominant carriers that provided [local] telephone exchange service on February 8, 1996." *Atlas Tel. Co. v. Oklahoma Corp. Comm'n*, 400 F.3d 1256, 1262 n. 5 (10th Cir. 2005) (citing 47 U.S.C. § 251(h)(1)).

Global disputes defendants' assertions in this regard.  Global contends that its own "internal analysis reveals that Defendants have paid a total of $104,000.00 in PIC-Dispute charges."  Global's Mem. of Law (Dkt. #37-1) at 6; Lord Aff. (Dkt. #37-3) ¶ 4.

Both sides here contend that the other has not submitted sufficient proof of its claims concerning the PICC charges, but in my view neither side has done so.  Global has done little more than make a conclusory assertion that defendants have paid $104,000, and although defendants have submitted voluminous payment records, they are not detailed enough to allow the Court to determine, as a matter of law, how much defendants have paid for these charges.

The records indicate that defendants paid Global certain amounts on certain dates, and those payments are broken down into some categories (*e.g.*, "Direct Switched Outbound Interstate"), but it is impossible to determine whether they support defendants' assertion that they paid Global some $419,000 in PICC charges.  *Cf. Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1551 n.8 (11th Cir. 1987) (stating that "[r]elying on an appellate court to sort through the record and calculate the appropriate damages merely delays achieving a just and reasonably accurate final judgment") (quoting *Dealke v. John E. Graham & Sons*, 756 F.2d 821, 834 (11th Cir. 1985)), *cert. denied*, 486 U.S. 1033 (1988); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254, 1261 (M.D.Ala. 2001) ("Counsel simply cannot ask the court to wade through the impenetrable jungle of the record" without sufficient guidance).  Although Global is entitled to summary judgment on the issue of liability for PICC charges, then, calculation of its damages must await trial, unless the parties can agree on the correct amount.  *See Citicorp Leasing, Inc. v. Kusher Family Ltd. Partnership*, No. 05

Civ. 9163, 2006 WL 1982757, at *8 (S.D.N.Y. July 14, 2006) (finding that defendants were liable

to plaintiff but that "[t]riable issues of fact as to the calculation of various damages components still

remain, and this must be decided at trial").


**III. Defendants' Counterclaims**

**A. Effect of Bankruptcy Proceedings**

On January 28, 2002, Global Crossing Ltd. and fifty-four of its subsidiaries, including the

plaintiff in this action, filed a voluntary Chapter 11 petition in the United States Bankruptcy Court

for the Southern District of New York.  An automatic stay of all claims against the debtors took

effect on that date pursuant to 11 U.S.C. § 362.  The debtors' Plan of Reorganization ("Plan")

became effective on December 9, 2003.  Dkt. #37-7 at 12.

Section 1141(d) of the Bankruptcy Code provides that in general, and unless otherwise

provided by the plan itself, "the confirmation of a plan ... discharges the debtor from any debt that

arose before the date of such confirmation."  In addition, the Plan here provided that upon its

effective date, all entities holding any claims against the debtors were permanently enjoined from

commencing or continuing any action or other proceeding to collect or recover any money or other

property on account of such claims.  *In re Global Crossing Ltd.*, No. 02-40188, Dkt. #2586 § 9.5(a)

(S.D.N.Y. Dec. 26, 2002).

One other order of the bankruptcy court is relevant here as well.  On December 13, 2002, the

bankruptcy court issued an order ("cure order") authorizing the debtors to assume certain executory

contracts, and fixing the "cure cost" with respect to each of those contracts, *i.e.*, the amount necessary to cure any defaults under the contracts.[8]  The order provided that the cure costs listed in the order "are final and binding for all purposes and constitute a final determination of total cure required to be paid in connection with assumption of each such executory contract," and that they "shall not be subject to further dispute or audit ... ."  *Id.* Dkt. #2516 ¶¶ 5, 6.  Global's contract with OLS was among the contracts encompassed by the cure order, and the cure "cost"  was listed at zero dollars.  *See id.* Ex. A at 6025.

Although the parties had briefed the effect of these orders on defendants' counterclaims in this case, at oral argument on the summary judgment motions, counsel for defendants stated that he was not "prepared to say at th[at] stage of the game" whether defendants would agree to withdraw any of their counterclaims based upon the bankruptcy proceedings.  Dkt. #82 at 8.  The Court therefore gave the parties additional time to submit papers setting forth  their respective positions on this matter.

In a letter to the Court dated November 16, 2006, counsel for defendants stated that "OLS consents to the dismissal of its Counterclaims to the extent they arose before December 9, 2003,"

---

[8]        Section 365 of the Code ... provides that ... a trustee or chapter 11 debtor-in-possession may, with court approval, assume or reject any executory contract or unexpired lease of the debtor.  Assumption is in effect a decision to continue performance.  It requires the debtor to cure most defaults and continues the parties' rights to future performance under the contract or lease.

*In re Penn Traffic Co.*, 524 F.3d 373, 378 (2d Cir. 2008) (citations and footnote omitted); *see also In re National Gypsum Co.*, 208 F.3d 498, 504-07 (5th Cir. 2000) (explaining debtor's choice to reject or assume executory contract under § 1141(d) and effects of assumption).

but that "TeleUno's Counterclaims all arose after the Confirmation Date, and are not barred and hence are retained."  Counsel for Global responded by letter dated November 22, 2006, stating that Global agreed that "OLS's counterclaims that arose or accrued prior to December 9, 2003 are barred," adding, "We do not believe any OLS counterclaims remain."  Global's counsel also stated that they were "unable to state whether any or all of Teleuno's claims survive."

By letter dated November 28, 2006, however, defense counsel stated that they wanted to "clarify [their] position on the effect of Plaintiff Global Crossing's Bankruptcy on Defendants' Counterclaims."  Counsel stated that OLS "consent[ed] to the dismissal of its Counterclaims arising before December 9, 2003," but OLS's position was that this did not encompass all of its counterclaims.  Counsel stated that "[f]or reasons not related to Plaintiff's Bankruptcy Court's Confirmation of Plan and Cure Order, Defendants, OLS and TeleUno, hereby dismiss Count III Counterclaims" for tortious interference with prospective business prospects," but they added that OLS took the position that its remaining five counterclaims survived to the extent that they are based on *post-confirmation* acts of Global.  The letter stated that the purportedly surviving counterclaims brought by OLS and TeleUno comprised damages totaling $553,800.95.

Plaintiff's counsel then sent the Court a letter in reply dated December 5, 2006.  Counsel asserted that in their November 16 letter, defense counsel had "acknowledged that all of Defendant OLS' counterclaims should be dismissed as a result of Global Crossing's bankruptcy," and that "OLS ha[d] reversed course" on that issue in its November 28 letter.

Having reviewed the parties' submissions on this matter, both pre- and post-argument, I conclude, first, that defendants have not conceded that OLS's counterclaims are completely barred. Defense counsel's November 16 letter stated that "OLS consents to the dismissal of its Counterclaims to the extent they arose before December 9, 2003," but it did not state explicitly whether defendants were taking the position that all, or simply some, of OLS's counterclaims fell into that category.

I also conclude that defendants' counterclaims are barred to the extent that they arose prior to the effective date of the Plan, December 9, 2003, but that issues of fact remain concerning the extent to which the counterclaims are based on events that occurred *after* that date. As stated, defendants did not terminate the contracts at issue here until March 2005. Although the counterclaims do reference certain events that allegedly occurred prior to December 2003, that does not mean that the claims completely predate the Plan confirmation date. *See Holywell Corp. v. Smith*, 503 U.S. 47, 58 (1992) ("Even if § 1141(a) binds creditors of the corporate and individual debtors with respect to claims that arose before confirmation, we do not see how it can bind ... any ... creditor with respect to postconfirmation claims"); *Southwest Marine Inc. v. Danzig*, 217 F.3d 1128, 1140 (9th Cir. 2000) ("while the plan binds pre-confirmation creditors, it does not bind post-confirmation creditors"), *cert. denied*, 532 U.S. 1007 (2001).

Likewise, the fact that the cure cost of the OLS contract was listed at zero dollars in the cure order is of no moment to defendants' counterclaims, to the extent that they arose after the confirmation date of the plan. *See National Gypsum*, 208 F.3d at 505-06 (explaining that "[a]n

assumed ... contract will remain in effect through and then after the completion of the reorganization," that both the debtor and non-debtor parties "must continue to perform," and that "the debtor party must take full account of the cost to cure all *existing* defaults owed to the non-debtor party when assessing whether" to assume the contract) (emphasis added).  To the extent that the proof establishes that damages on the counterclaims were incurred prior to the confirmation date, that may be dealt with at trial through appropriate jury instructions and rulings.

**B. Merits of the Counterclaims**

Global also contends that the counterclaims should be dismissed on the merits because they are all based on the allegation that Global improperly billed defendants, and that Global therefore improperly terminated defendants' service.  Global argues that if the Court finds that Global properly invoiced defendants, then the counterclaims must fail.

To some extent, that contention is well taken.  The first counterclaim, for example, which alleges breach of contract, is based in part on defendants' allegation that Global improperly imposed PICC charges on defendants.  *See* Answer (Dkt. #5) ¶¶ 114-28.  I have already found those allegations to be without merit, as explained above in this Decision and Order.

The first counterclaim also alleges, though, that Global invoiced defendants for incorrect *rates*.  *Id.* ¶¶ 130-47.  Such allegations also form part of the basis for the second, fourth, sixth, seventh, eighth and ninth counterclaims.[9]  *See* Dkt. #5 ¶¶ 154, 156, 181, 188, 197, 203, 210.  While

---

[9]The fifth counterclaim seeks attorney's fees under the Federal Communications Act, and
(continued...)

it appears that some of that alleged overbilling occurred prior to the confirmation date of the Plan,
*see* Dkt. #29 ¶¶ 65-78, at this juncture I cannot determine as a matter of law that all of this activity
occurred prior to that date.  *See* Decl. of Alan McNeil (Dkt. #28) ¶ 39 (alleging that Global
"consistently" overcharged defendants for certain calls).

In addition, the evidence before me does not make it possible to decide, as a matter of law,
whether Global did or did not overcharge defendants.[10]  Global has submitted some evidence, *see*
Dkt. #37-7 Ex. O, purporting to show that defendants were actually charged at lower rates for
international service than those called for in the agreements, but that evidence is not so clear-cut that
the Court can grant it judgment on this claim as a matter of law.  Likewise, although the evidence
submitted by defendants in support of their allegations of overcharging (consisting of a number of
sworn declarations and supporting documentary exhibits) may not entitle them to summary judgment
on these counterclaims, I do not agree with Global's assertion that "[d]efendants have offered no

---

[9](...continued)
is thus derivative, in part, of plaintiff's allegations of overbilling.  As stated, Counterclaim III has
been voluntarily withdrawn.

[10]Global also contends that defendants have acknowledged that "all disputes over
International service charges were resolved when Global Crossing credited Defendants'
accounts" for certain disputed amounts.  Global's Mem. of Law (Dkt. #37-1) at 43.  Defendants
do state that certain charges concerning calls to the Dominican Republic were resolved when
Global gave defendants a credit of about $477,300, Dkt. #24 at 8, but I am not convinced on the
record before me that *all* such disputes have been resolved.  Defendants contend that the
overbilling was widespread and consistent, and the resolution of this one particular dispute
appears to be cited simply as some recognition on Global's part that it had been overcharging
defendants.  If defendants cannot substantiate their claims of other overbilling at trial, such
failure of proof may be dealt with at that time.

- 27 -

evidence to support their claim of purported overcharges." Plaintiff's Mem. of Law (Dkt. #37-1) at 45.[11]

With respect to the second counterclaim, however, for tortious interference with contracts, I find that Global is entitled to summary judgment. "In order to succeed on such a cause of action, [OLS and TeleUno] must establish: (1) the existence of a valid contract between [one of them] and a third party, (2) [Global's] knowledge of that contract, (3) [Global's] intentional procurement of the third party's breach of that contract without justification, and (4) damages." *R.U.M.C. Realty Corp. v. JCF Associates, LLC*, ___ A.D.3d ___, 2008 WL 2207094, at *1 (2d Dep't 2008) (citing *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424 (1996)). To survive a motion for summary judgment on this claim, defendants must also identify a particular contract that has been breached as an alleged result of Global's wrongful actions. *See Tang v. Jinro America, Inc.*, No. CV-03-6477, 2005 WL 2548267, at *7 (E.D.N.Y. Oct. 11, 2005) (stating that defendants were entitled to summary

---

[11]Implicitly recognizing that defendants have submitted *some* evidence on this matter, Global contends that the Court should disregard some of the evidence that defendants rely upon in support of their allegations of overbilling, on the ground that the evidence was not timely produced in this litigation. *See* Plaintiff's Reply Brief (Dkt. #75) at 18-19. This evidence, particularly an "audit summary" prepared by defendants, was the subject of a motion to compel filed by Global. *See* Dkt. #64. Global later voluntarily withdrew that motion without prejudice, however, Dkt. #73, apparently based upon defendants' supplemental responses to Global's discovery reqeusts. *See* Plaintiff's Reply Brief Ex. 1. In his letter withdrawing the motion, Global's counsel stated that "[i]t is possible that certain limited issues raised in Global Crossing's Motion may need to be revisited, but it would only be necessary to do so after the Court has had a chance to rule on the parties' pending Cross Motions for Summary Judgment." *Id.* No suggestion was made at that time that the alleged tardiness of defendants' production of this evidence would itself be an issue on the pending summary judgment motions, nor did Global seek any further discovery-related relief thereafter. In light of this background, I decline Global's suggestion to disregard defendants' evidence in support of their allegations of overbilling in considering the parties' motions for summary judgment.

judgment where "[p]laintiff ha[d] made no particular allegations of interference with specific contracts or business relationships"); *Millar v. Ojima*, 354 F.Supp.2d 220, 230 (E.D.N.Y. 2005) ("In order to state a [tortious interference with contract] claim, the plaintiff is required to identify a specific contractual term that was breached") (internal quotation marks omitted); *G-I Holdings, Inc. v. Baron & Budd*, 179 F.Supp.2d 233, 253 (S.D.N.Y. 2001) (dismissing a tortious interference with contract claim for both the failure to allege "a valid, existing contract or any terms of contract with a third party," as well as how the third party breached its contract with the plaintiff).

Here, OLS and TeleUno have alleged only that Global knew that the purpose of the agreements was to enable defendants to enter into contracts with third-party end-users, and that Global must have known that if Global overcharged defendants, defendants would be forced to pass those charges on to their customers, resulting in the loss of many of their customers. Def. Mem. of Law (Dkt. #24) at 28-29. Absent a showing of some specific customers who were lost as a result of Global's acts, however, that is not enough to defeat Global's motion for summary judgment. Accordingly, Global is entitled to summary judgment on defendants' second counterclaim.

Although Global raises, in summary fashion, several other arguments relating to defendants' counterclaims, they generally relate to the weight and persuasiveness of the evidence submitted by defendants. *See* Plaintiff's Mem. of Law (Dkt. #37-1) at 42-44. Those are all matters best dealt with at trial, however. If proof is lacking to support a verdict in defendants' favor on a particular

counterclaim, that can be addressed through appropriate jury instructions or a motion for judgment

as a matter of law under Rule 50(a).[12]


## IV. Defendants' Motion to Strike

Defendants have moved pursuant to Rule 12(f) of the Federal Rules of Civil Procedure to

strike certain portions of Global's Memorandum of Law (Dkt. # 37) and Exhibit E to that

memorandum. The motion relates to an opinion of the Public Utilities Commission ("Commission")

of the State of California that was issued on April 27, 2006, which has been submitted by Global in

connection with the pending summary judgment motions.

In that order, the Commission imposed a fine on a New Century Telecom, LLC ("NCT"), for

certain violations of the Commission's Rules of Practice and Procedure, prior decisions of the

Commission, and the California Public Utilities Code. NCT was represented by the Helein Law

Group ("Helein"), which is also defendants' counsel in the case at bar.

In addition to its rulings concerning NCT, the Commission found that Helein had "violated

Rule 1 [of the Commission's Rules of Practice and Procedure] by providing false information to the

Commission." Dkt. #37-3 at 41. The Commission added that "in lieu of a fine, today's Decision

requires the Helein Law Group to provide notice in all documents filed at the Commission that the

---

[12]Defendants also allege that they were wrongfully assessed late payment charges. *See*
Dkt. #24 at 10. The basis for this claim appears to rest on defendants' assertion that the
underlying charges were themselves invalid, however, so that the validity of the claim is
dependent on that of defendants' other counterclaims. Resolution of this claim must therefore
await trial as well.

Helein Law Group was found by today's Decision to have violated Rule 1.  This requirement shall end after three years."  *Id.*

Specifically, the Commission found that NCT and Helein "knowingly made a false statement regarding a material fact when the informed the Commission [on May 13, 2004] that there were no pending complaints at another state commission alleging significant wrongdoing" on the part of NCT, when in fact they knew that NCT was at that time being investigated by the Florida Public Service Commission for forty-two alleged "slamming" violations.   Dkt. #37-3 at 43.   The Commission also found that NCT and Helein compounded this wrongdoing on January 31, 2005, when they denied having made a false statement in NCT's May 13 submission.  Dkt. #37-3 at 44. The Commission found that the January 31 submission itself contained false statements in addition to those in the May 13 submission.  *Id.*

The Commission went on to state that

the Helein Law Group aided and abetted violations of Rule 1.  Consequently, the firm cannot be trusted, and those who rely on information provided by the Helein Law Group should be warned.  To this end, we will require that documents filed by the Helein Law Group in any current or future proceeding to state in a prominent manner that the firm was found to have violated Rule 1 by today's Decision.  Further, the Helein Law Group shall amend any applications currently pending at the Commission to include the aforementioned warning. This requirement to provide the warning shall end three years from the effective date of today's Decision.

*Id.* at 58-59 (footnote omitted).

In its memorandum of law in opposition to defendants' motion for summary judgment and in support of its cross-motion for partial summary judgment, Global stated that "Defendants' efforts to 'hide the ball' and present only one side of the story [concerning the course of Global's dealings

with defendants] must be viewed with extreme suspicion, light of some alarming recent findings by the California Public Utilities Commission."  Dkt. #37-1 at 4 n. 4.  Global then quoted some of the Commission's findings concerning Helein.  *Id.*

In their motion to strike, defendants contend that the Court should not consider the Commission's decision because it was issued without notice to Helein or NCT, and therefore in violation of Helein's due process rights, and because, in any event, the Commission's decision is irrelevant to the issues in this case.  In response, Global asserts that the material in question is not subject to a motion to strike under Rule 12(f) because it is not contained in a "pleading," that the material does not, in any event, meet the standard for granting a motion to strike under that rule, and that the material quoted from the Commission's decision is relevant to this litigation.

After considering the motion to strike and the arguments of both sides, the Court denies the motion as moot.  Even if I were to consider the material at issue, it would have no effect on my decision in this case.  There has been no showing that any materials submitted by Helein on behalf of defendants in this case contain any actual misrepresentations of fact, and the Commission's finding that, based on Helein's submissions in the proceeding before it, Helein "cannot be trusted," simply has no bearing on my decision here.[13]

———————————

[13]I note, however, that there is support for Global's contention that Rule 12(f) applies only to pleadings.  *See Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 868 (1ˢᵗ Cir. 1997); *Rochester-Genesee Regional Transp. Authority v. Hynes-Cherin*, 531 F.Supp.2d 494, 519 n. 17 (W.D.N.Y. 2008).  In addition, the Commission's decision, as well as a subsequent decision denying Helein's application for rehearing (which was based in part on Helein's due process argument) are both matters of public record, *see Re New Century Telecom, Inc.*, No. 06-04-048, 2006 WL 1222957 (Cal. Pub. Util. Comm'n Apr. 27, 2006); No. 06-09-025, 2006 WL 2620053

(continued...)

**V. Relief**

The final question that must be addressed is what relief should be granted at this point. The Court has granted summary judgment for Global on the MMUC and PICC issues. The dispute over the MMUC issue, at least, appears to be strictly over the enforceability of the MMUC provisions, not the amount due. Nevertheless, I do not believe that it would be advisable to enter judgment at this time in Global's favor on these claims, since some of defendants' counterclaims remain pending and may eventually offset the amounts to which Global is entitled. *See Waxman v. Envipco Pick Up & Processing Services, Inc.*, No. 02 Civ. 10132, 2006 WL 236818, at *12 (S.D.N.Y. Jan. 17, 2006) (granting defendant's motion as to liability with respect to its conversion counterclaim, but deferring calculation of damages to trial, in part because "the amount of such damages will ultimately be offset against the damages owed to plaintiffs on their breach-of-contract claim"); *Control Techniques, Inc. v. Oliver*, Civ. No. N-90-237, 1991 WL 47345, at *1 (D.Conn. Feb. 21, 1991) (granting summary judgment to plaintiff on one count of its complaint, but stating that "[f]inal computation of damages under Count One ... must await the disposition of the remaining claims," in part because of "the possibility that Oliver's counterclaim, if successful, may offset the debt owed to CTI in Count One"); *In re Fulcrum Direct, Inc.*, Nos. 98-1767, 2003 WL 1878070, at *7 (Bankr. D.Del. Apr. 14, 2003) (finding that debtor Fulcrum had "established that it [wa]s owed $98,064.55 by Associated Footwear," but adding that "whether Associated Footwear, Inc., is entitled to offset any of the

---

[13](...continued)
(Cal. Pub. Util.Comm'n Sept. 7, 2006), so regardless of whether they are literally contained in Global's papers, the only real issue is whether they are relevant to the issues before me and thus whether I should consider them, not whether they should be stricken from defendants' papers.

$98,064.55 against its alleged damages for Fulcrum's alleged breach of contract requires further evidence," and that "[t]herefore, entry of a judgment on this issue is deferred pending further order"). I therefore grant summary judgment in Global's favor on the issue of liability with respect to those claims, but will not enter judgment as to damages until the parties' remaining claims have been resolved.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #23) is denied. Defendants' motion to strike (Dkt. #42) and supplemental motion to strike (Dkt. #69) are denied as moot.

Plaintiff's cross-motion for summary judgment (Dkt. #39) is granted in part and denied in part. Plaintiff's motion is granted on the issue of liability with respect to plaintiff's claims that defendants failed to pay its monthly minimum usage charges and primary interexchange carrier changes. The calculation of damages on those claims must await further proof or stipulation between the parties.

Plaintiff's motion for summary judgment on defendants' counterclaims is also granted in part and denied in part. Defendants' counterclaims are dismissed to the extent that they arose prior to December 9, 2003. Defendants' second counterclaim, for tortious interference with contracts, and their third counterclaim, for "tortious interference with prospective business prospects," are dismissed in their entirety.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
July 8, 2008.